DeMAT AIR, INC.

v.

The UNITED STATES.

No. 143–83C.

United States Claims Court.

March 25, 1983.

As Amended March 29, 1983.

V. Frederic Lyon, Washington, D.C., for plaintiff.

Mark A. Cymrot, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, for defendant; Ruth Yudenfriend, Defense Fuel Supply Center, of counsel.

## OPINION

GIBSON, Judge:

This is a pre-award bid protest action which was commenced upon plaintiff's filing its Complaint for Declaratory and Injunctive Relief and its Motion for Temporary Restraining Order (TRO) on March 14, 1983. An expedited hearing was held on the TRO on March 14, 1983. Based on the pleadings of the parties, and oral argument as a supplement thereto, the court found that the plaintiff made the requisite minimum showing and granted the TRO upon the defendant's representation that it could not maintain the *status quo* pending a hearing (on March 21, 1983) on the prayer for a preliminary injunction. By order dated March 15, 1983, the court ordered that the trial on the merits be consolidated with that hearing pursuant to RUSCC 65(a)(2) and scheduled the same for March 21, 1983.

Upon the consideration of the testimony of the witnesses and the documentary evidence received at the trial on March 21 and 22, 1983, the court finds that the contracting officer was arbitrary and unreasonable, thereby abusing his discretion, in that he improperly refused to consider plaintiff's timely filed, unsigned proposal, submitted pursuant to the defendant's Request for Proposals, as would have been consistent with the spirit and the tenor of applicable regulations. Therefore, the defendant is permanently enjoined as prayed for in plaintiff's Complaint and as stated hereinafter.

## FACTS

The basic facts in this case are uncomplicated, not in dispute, and can be briefly stated. The Defense Fuel Supply Center (DFSC)[1] issued Solicitation No. DLA600–83–R–0002 (hereinafter R–0002) under the Defense Acquisition Regulations (DAR)[2] for a procurement by negotiation, *i.e.,* Requests for Proposals (RFPs) for the purchase of Into-Plane fuel and service for various military, civilian agency, and U.S. designated aircraft at various (70) airports throughout the United States and in Samoa. The Solicitation, Offer, and Award form initially set November 16, 1982, at 3 p.m., as the deadline for the submission of responsive offers. Plaintiff submitted a proposal, pursuant to the RFP, to supply the aviation fuel requirements at the Acadiana Regional Airport, New Iberia, Louisiana. The initial offer due date was extended from November 16, 1982, to November 23, 1982, by an Amendment of Solicitation/Modification of Contract No. 0001, dated November 1, 1982. The evidence is undisputed that plaintiff's offer was *timely* filed under the original deadline.

The multi-page offer filed by plaintiff contains, on the face page, a block # 12 which was duly filled in as to the name of the persons authorized to sign the offer. However, block # 13, the signature block, was not filled in. In other words, plaintiff's offer was not signed, although timely submitted. However, elsewhere in plaintiff's offer, at page 8, paragraph B33 requests the names, title, and telephone numbers of persons authorized to conduct negotiations, and the following appears there:

> "Philip J. Devine
> President (318) 365–7334
> Edward G. Matulat (318) 365–7334."

For no apparent reason other than that the plaintiff's offer was submitted unsigned, the contracting officer summarily rejected it and refused to give it any consideration whatsoever.

The original award date for the subject contract was scheduled for March 1, 1983; however, in view of the protest raised by plaintiff and this litigation, the contracting officer apparently has reset said award date for March 31, 1983, and performance thereunder is scheduled to commence April 1, 1983. The contracting officer has held negotiations with respect to other offers under the RFP at the Acadiana Regional Airport; however, plaintiff was not included inasmuch as its unsigned offer was deemed not to be an offer.

The testimony of Philip J. Devine, president and only witness for the plaintiff, may be summarized as follows. Mr. Devine stated that he resides in Iberia, Louisiana; that DeMat Air, Inc. began operations about a year ago at the Acadiana Regional Airport; that he and his non-participating partner have authority to bind DeMat; that they have just constructed a small hangar and an underground fuel facility, and for his initial year of operation his gross receipts approximated $100,000 with a resulting net

---

1. The DFSC is the central procurement agency for all fuel used by the military services and the Federal Government. Requirements for various locations come into the DFSC which are incorporated into a solicitation. Said solicitation is thereafter distributed by mail to interested parties (prospective offerors).

2. The DAR are set forth at 32 C.F.R. § 1–100 *et seq.* (1982). We shall refer to section and subsection numbers alone in this opinion.

loss. He stated that 50% to 75% of his gross receipts is from a verbal contract with the military installation at the airport; that there are two other fuel companies that service the airport, however, his company can provide better service to the Government in that they are only three minutes away from the points of service to military aircraft whereas his competitors are approximately four miles away (one way).

With respect to the preparation and the mailing of DeMat's unsigned offer to the DFSC, Mr. Devine testified that initially he was contacted by the commander of the military facility at the airport inquiring whether DeMat wished to be included on a vendors list to receive a proposal to bid on a fuel contract. He concurred, and shortly thereafter he received the proposal forms in the mail sometime in October 1982. He further testified that he prepared a pencil copy of his proposal with the assistance of his secretary; that he reviewed the completed pencil copy which was given to the typist for typing; that the typed final offer was placed on his desk in an envelope with other outgoing mail and his secretary, thinking that said offer had been signed, caused it to be mailed. When asked to explain why he did not sign, he stated: "It was an extreme oversight on my own behalf. I really can't answer why it was not signed. I thought I had signed it." (Tr. 17). He further testified that he intended DeMat to be bound by the terms of the unsigned proposal which he submitted; and that he always believed that he had signed his proposal and was simply waiting to hear from the DFSC with respect to his offer.

Mr. Devine testified that sometime in January he heard that one of the fuel facility operators at the airport was undergoing an inspection, which is a preliminary procedure prior to a possible award. About the same time, Mr. Devine heard a rumor that one of the proposals had been submitted unsigned. He stated, "It didn't even ring a bell with me, ...." (Tr. 22). He fully believed that plaintiff's offer had been signed. At that time he telephoned the DFSC inquiring with respect to his offer and he was advised by the contracting offi-

cer (Mr. Munns) that it was submitted unsigned. He stated that this was the first time he had heard that his submitted offer was not signed and Mr. Munns was that person who informed him. Mr. Devine also testified that *prior* to filing his offer with the DFSC he had a telephone conversation with Mr. Munns regarding the preparation of the proposal, when the contract could be expected to be awarded, and the requirements to qualify as a bidder (Tr. 21, 39); that he does not know the terms of any other offeror's proposal; that his present verbal contract with the military at the airport will become part of the present proposal; and, if plaintiff is not successful, he will lose at least 75% of his present business.

Mr. E.J. Munns, the contracting officer for the DFSC, based in Alexandria, Virginia, testified as the only witness for the defendant. His testimony may be summarized as follows:

The Acadiana Airport was one of 70 locations included in Solicitation R–0002. This was the first Solicitation in which Acadiana Airport was included and the DFSC was supplied the names of four entities as prospective suppliers there including plaintiff [Ex. 4]; however, only three names were added to the bidders mailing list, including plaintiff's [Ex. 5].

In response to the dissemination of the solicitation, the DFSC received 75 proposals with reference to 54 of the 70 locations and there were a number of airports in which only one proposal was submitted. (Tr. 76, 77.)

Mr. Munns' subordinate, one Ms. Joyce McDermott, informed him in the latter part of December 1982 that plaintiff's offer was submitted unsigned. He thereupon examined each page thoroughly for signatures or initials, which would evidence an intent to be bound, and found none. He then made a decision that plaintiff's proposal was not a valid offer, which conclusion was concurred in by legal counsel to the DFSC.

When Mr. Devine called the DFSC in early January 1983, the contracting officer

told him that there was no signature or initials on plaintiff's bid. Mr. Devine offered to fly to Washington to sign it, but Mr. Munns told him "that would be impossible, that an unsigned offer is not considered an offer." Mr. Munns further testified concerning plaintiff's proposal that "I did not keep it, I just set it aside. It wasn't even looked at or analyzed." (Tr. 55). Mr. Munns also recalled receiving in January 1983 an unsolicited letter from a military supervisor dealing with military aircraft at Acadiana Airport to the effect that the fuel service provided by plaintiff was good in contrast to the less than good service of one of its potential competitors under the RFP.

There were additional telephone conversations in January and February 1983 between plaintiff and Mr. Munns as well as between plaintiff's counsel and Mr. Munns which culminated in an exchange of letters by plaintiff's counsel and Mr. Munns in which the parties memorialized their respective positions. [Exs. 7, 8, 9.]

On cross-examination, Mr. Munns admitted that a mistake in procurement by advertising is treated differently than in negotiated procurements and that different underlying policy considerations apply (Tr. 62, 63); that, if he were to receive only one proposal respecting an airport which was unsigned, he would consider that to be "remedial [sic];" and that in that context it "is correct" that he could remedy the failure to sign something. (Tr. 77.) However, at an earlier point he testified that "If someone submitted a proposal like the DeMat Air bid that was unsigned, I would not even call the company about that" (Tr. 72); and at a later point in time during cross-examination he stated that "As a contracting officer, yes. I prefer to have competition, yes." (Tr. 81).

Given the nature of the proceedings and in particular the content of the record, the court felt constrained to question both witnesses. The court inquired of Mr. Munns: "What is the total number of offerors (including plaintiff) who submitted proposals to DFSC in response to # DLA600–83–R–0002, and limited to Airport Location Item 1903, Acadiana Regional Airport?"

Mr. Munns refused to answer the court's question on the grounds that, in his opinion, the answer was privileged by virtue of DAR § 3–507.2. The court deemed the answer to this question to be extremely probative on the issue of whether the contracting officer, consistent with applicable regulations, was administering this procurement on a competitive basis to the "maximum practicable extent." Further, the answer undoubtedly would shed light on the question as to whether the witness was arbitrary or capricious and as a result thereof abused his discretion.

The court requested the parties to brief the issue, and after taking the matter under advisement, concluded that DAR § 3–507.2 did not provide a ground for the assertion of a privilege to the court's question for the reasons, *inter alia,* set forth in plaintiff's memorandum. Thereafter, plaintiff waived his right to hear or read the witness's response to the court's question and the court received the witness's response *in camera,* and in writing, as Court Exhibit No. 3. Said exhibit has been sealed and lodged with the Clerk of this court, pursuant to an order of this court, for review, if necessary, by the United States Court of Appeals for the Federal Circuit.

Finally, when the court asked Mr. Munns—how would the Government have been hurt if he had called the plaintiff and simply advised him that his offer was not signed and attempted to ascertain his intent with respect to being bound—he responded "Probably nothing at this time."

### Parties' Contentions

Plaintiff argues that the refusal of the contracting officer to consider its proposal under the RFP results from an unlawful, arbitrary, and capricious interpretation of the Defense Acquisition Regulations pertaining to unsigned proposals. It argues that defendant's bidding system will suffer no harm by granting consideration to plaintiff's proposal, but rather, to the contrary, the Government's interest in fostering com-

petition would be impaired by the *failure* to consider it. Plaintiff claims to qualify for special consideration in the procurement process, pursuant to the terms of the instant solicitation, as a "small business" entity (which is conceded by defendant). Plaintiff further asserts that, in view of financial commitments already made, it would unjustifiably be subject to financial loss should its proposal not be fully and fairly considered. Plaintiff also contends that no third-party bidder or bidders would be harmed since plaintiff does not seek *award* of the contract by this litigation, but only a fair and reasonable opportunity for its proposal to be considered. Plaintiff, therefore, seeks a permanent injunction against the contracting officer's consideration of any proposal or award of any contract under the RFP in issue and a declaratory judgment to the effect that DAR § 3–805.5 and § 2–405 do not bar plaintiff's proposal from consideration and award under the RFP.

Defendant argues that the contracting officer's rejection of plaintiff's proposal was entirely in accordance with bidding regulations, and therefore reasonable, and not an abuse of discretion (if in fact the contracting officer had any). Furthermore, the Government strenuously argued in its brief and at trial that the integrity of the contracting system is at stake in this proceeding. To allow plaintiff to cure belatedly the failure to sign its proposal would create the appearance of favoritism and give plaintiff an unfair advantage over other offerors. Also, in spite of this solicitation being a *negotiated* procurement as opposed to a formally advertised one, defendant contends waiver of the signature rules would create untolled uncertainties, possibly opening a "Pandora's box" of bogus proposals, and inviting litigation on almost any negotiated contract.

## DISCUSSION

 This court has had opportunity to expound on the standards and guidelines which should be followed when injunctive relief is sought in bid protest cases, such as the one presently before it, under its newly-granted equitable jurisdiction. *See* Federal Courts Improvement Act (FCIA) of 1982, Pub.L. No. 97–164, 97th Cong., 96 Stat. 25, 40, amending 28 U.S.C. § 1491, effective October 1, 1982. In *Baird Corporation v. United States,* 1 Cl.Ct. 662, 664–665 (Cl.Ct. 1983) (Lydon J.), the court stated:

"Judicial review of an agency's pre-award procurement decision is, and should be, extremely limited in scope. The court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable. It is the burden of the aggrieved bidder to demonstrate that there was no rational basis for the agency's determinations. *Princeton Combustion Research Laboratories, Inc. v. McCarthy,* 674 F.2d 1016, 1021–22 (3d Cir.1982); *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301, 1306 (D.C.Cir.1971). Judicial intrusions into the procurement process are generally limited, circumspect and infrequent, *Allen M. Campbell Co. Gen. Con., Inc. v. Lloyd Wood Const. Co.,* 446 F.2d 261, 264 (5th Cir.1971), as they should be. *M. Steinthal & Co. v. Seamans, supra,* 455 F.2d at 1300. *See also Allen M. Campbell Co. v. United States,* 199 Ct.Cl. 520, 522 (1972) (Nichols, J., concurring). Where injunctive relief is sought, which relief is deemed drastic in nature, the court must exercise great caution and even then, the aggrieved bidder should be made to establish its right to such drastic relief by means of clear and convincing evidence. *Goldammer v. Fay,* 326 F.2d 268, 270 (10th Cir.1964). Even in the exercise of sound judicial discretion, in the absence of overriding public interest considerations, the court should refuse to look favorably on declaratory or injunctive relief requests in pre-award bid protest actions, and should not overturn any pre-award procurement determination unless the aggrieved bidder establishes that there was no rational basis for the agency's determination. *M. Steinthal & Co. v. Seamans, supra,* 455 F.2d at 1301 . . . ."

On the other hand, a bidder may successfully challenge a Government procurement decision in the event of a clear and prejudicial violation of applicable statutes or regulations. It is important to note, however, that contracting officers may appropriately exercise wide discretion in their evaluation of bids and their application of procurement regulations. *Big Bud Tractors, Inc. v. United States,* 2 Cl.Ct. 188, at 192–93 (Cl.Ct. 1983) (Wood, J.).

This court has also had the opportunity to consider the legislative history of the FCIA insofar as it pertains to the court's new equitable jurisdiction in bid protest actions in *Quality Furniture Rentals, Inc. v. United States,* 1 Cl.Ct. 136 (Cl.Ct.1983) (Kozinski, C.J.). Citing pertinent language from the Senate Report on the FCIA, the court commented that "Congress did not intend that this court consider every alleged irregularity ... but only those irregularities which would deny a contractor a fair opportunity to compete." *Id.* at pp. 140–41. This emphasis on the grant of equitable jurisdiction to this court in order to foster and protect the competitiveness of the Government's contract system has particular application in the context of this case as will be evident below.

Framed in light of the standards and guidelines set forth above, the issue before the court is whether the contracting officer for the DFSC was irrational and unreasonable, thereby abusing his discretion in failing to seek clarification of whether plaintiff intended to be bound on its unsigned proposal and in eliminating that proposal from consideration in the negotiated procurement at issue.

■■■ The extent of discretion exercisable by a contracting officer in processing bids varies depending on whether the solicitation of those bids is under a procurement by formal advertising or by negotiation. The DAR contain "General Provisions" applicable to both types of procurement in section 1 thereof and particular provisions applicable respectively to procurement by formal advertising in section 2 and procurement by negotiation in section 3. It is readily apparent from a review of the regulations that, as would be expected from the ordinary meaning of the words, procurement by negotiation contemplates the exercise of greater discretion overall by a contracting officer, than in procurement by formal advertising. In *Keco Industries, Inc. v. Laird,* 318 F.Supp. 1361 (D.D.C.1970), involving injunctive relief in the pre-award stage of a negotiated contract prior to the grant of equitable jurisdiction to this court under the FCIA, the court commented on the distinction between the two procurement methods and its general effect on the role of courts in bid protest actions as follows:

"... the underlying purpose of bringing bid protests into the ... court is to protect the integrity of the bid process. Most of the cases so far presented to the Courts arose out of advertised procurement. By congressional direction this is the preferred method for letting Government contracts as it insures maximum price competition.... Deviation from this system is allowed in certain circumstances and the agency may negotiate such purchases as was done in this case .... But the limitation of the area where negotiation is permitted and the regulations prescribing the methods of negotiation demonstrate that the integrity of the negotiated procurement procedures should be afforded similar protection. *Since procurement officials are allowed wider discretion in negotiated procurement, the standard of review will differ from that used in advertised procurement.*" [Emphasis supplied.]

*Id.* at 1364. Also applicable to the case at bar is the *Keco* court's remark concerning minor deviations from established procedures to the effect that "the concept of responsiveness is not applicable to negotiated procurement ...." *Id.* at 1365.

It is apparent from a general review of the regulations that negotiation procurement contemplates a greater degree of contact between the contracting officer and the prospective contractors than procurement by formal advertising. With this in

mind we note the particular regulations pertinent here which are those dealing with minor informalities and irregularities on proposals in the pre-award stage of procurement. DAR § 3–805.5 states in part:

"(b) Minor informalities or irregularities and apparent clerical mistakes shall be resolved *substantially* as prescribed in 2–405 and 2–406.2, respectively, . . . ." [Emphasis supplied.]

The cross-reference is to regulations in the procurement by formal advertising section of the DAR. Section 2–405 states in pertinent part:

". . . Examples of minor informalities or irregularities include:

\* \* \* \* \* \*

(iii) failure of a bidder to sign his bid, but only if—

(A) the firm submitting the bid has formally adopted or authorized the execution of documents by typewritten, printed, or rubber stamped signature and submits evidence of such authorization and the bid carries such a signature, or

(B) the unsigned bid is accompanied by other material indicating the bidder's intention to be bound by the unsigned bid document such as the submission of a bid guarantee with bid, or a letter signed by the bidder with the bid referring to and clearly identifying the bid itself;"

Mr. Munns' testimony here indicates that as contracting officer he interpreted §§ 3–805.5 and 2–405(iii) very strictly when it was brought to his attention that plaintiff's timely filed proposal was missing the requisite authorized signature. This was on or about December 27, 1982, one month past the offer submission deadline, but approximately three months prior to anticipated contract award. His meager attempt to justify accepting the proposal was limited to perusing the package submitted by plaintiff in an effort to find perhaps a signature or initials on some other page which, according to his testimony, would have been sufficient to evidence an intent to be bound. Mr. Munns testified that in a negotiated

procurement he would as a general rule seek clarification of obvious errors, but since plaintiff's offer was unaccompanied by the indicia of authorization outlined by DAR § 2–405, he considered it unacceptable and apparently thought no further about it until contacted by Philip Devine, plaintiff's president.

■ Plaintiff argues that § 2–405 is not intended to apply *strictly* in negotiated procurements; that the term "substantially" in § 3–805.5 contemplates wider discretion on the contracting officer's part in regard to proposal irregularities under negotiated procurements, including omitted signatures. Plaintiff urges that under negotiated RFPs, as we have noted from *Keco Industries, Inc. v. Laird*, 318 F.Supp. at 1365, the concept of responsiveness is not directly applicable as in procurement by formal advertising. Rather, plaintiff argues, "non-responsiveness" is itself a subject of negotiation. *See DFP Incorporated*, B–180292, 74–1 CPD 303. It was therefore incumbent on Mr. Munns, when he learned of the absence of an authorized signature on plaintiff's proposal, at the very least to have telephoned or written to plaintiff and inquired as to the apparent oversight. We agree with plaintiff in the circumstances presented that the failure to do so was patently unreasonable.

A look at the public interest considerations present here will also aid our analysis. There can be no doubt that a contracting officer has, as a principal responsibility under the DAR, the duty to maximize competition whenever possible in government procurement. DAR General Provisions § 1–300.1 entitled "Competition" states:

"All procurements, whether by formal advertising or by negotiation, shall be made on a competitive basis to the *maximum* practicable extent." [Emphasis supplied.]

The same policy is echoed again in section 3 which is devoted to procurement by negotiation. Section 3–101(d) states:

"Negotiated procurements shall be on a competitive basis to the *maximum* practi-

cal extent. When a proposed procurement appears to be necessarily non-competitive, the contracting officer is responsible not only for assuring that competitive procurement is not feasible, but also for acting whenever possible to avoid the need for subsequent noncompetitive procurements." [Emphasis supplied.]

The policy to foster competition is effectuated in large measure by § 3–805, which is entitled "Written and Oral Discussions." That section requires the contracting officer to initiate discussions with those offerors under an RFP whose proposals are in a "competitive range" prior to awarding the subject contract. This activity most markedly distinguishes the formal advertising procurement procedures, where such discussions do not occur, from negotiated procurements. Other provisions of the DAR foster the policy of maximizing competitiveness. Section 1–306 provides that approval signatures on contracts shall be *minimized* to the greatest extent possible. DAR § 3–805.5, with which we are particularly concerned here, mandates that the contracting officer "*shall* examine *all* proposals" [emphasis added] for informalities with an obvious view toward resolving them in favor of inclusion of the problem proposals *for* consideration with the others. DAR § 3–805.2 provides that the "competitive range" of proposals over which the contracting officer conducts negotiations shall include "*all* proposals which have a reasonable chance of being selected for award" and "doubt [about a proposal] shall be resolved by including it."

There is no doubt that the signatures required by the terms of the RFP in issue here, as on other proposal solicitations, was to manifest to the contracting officer that the offerors intended to be bound by their offers. The Government argues that without a binding authorized signature appearing on the face of the proposal, the offeror could, to the disadvantage of the Government, disavow his offer if the contracting officer decided to accept it without negotiation (which is his privilege under the DAR) or capitalize on his mistake by choosing to accept or decline the contract after other

bids have been opened with knowledge of his competitors' positions. The thrust, then, of defendant's argument is that the requirement in DAR § 3–805 that the contracting officer resolve proposal irregularities "substantially" in conformity to § 2–405 means that unless an offeror shows within the terms of the latter regulation his intention to be bound, an unsigned proposal must be rejected.

The court does not believe that the contracting officer's strict adherence to the signature requirement was reasonable in the specific circumstances presented here. Plaintiff does not contend that its *unsigned* offer, without more, should be accepted and considered together with the signed offers, but only that the contracting officer here should have contacted it to determine whether its officers intended to bind plaintiff when the proposal was submitted, and allowed it the opportunity to correct the omission. It is clear that plaintiff would have gained no competitive advantage over competitors from being allowed to correct his unsigned proposal, since, unlike the situation in procurement by formal advertising where bids are publicly opened at the appropriate time, offers under negotiated RFPs remain secret until award of the contract. Defendant's concern in that regard is therefore misplaced.

In addition, other evidence introduced at trial viewed in light of the strong policy to foster competition in government procurement outlined above disposes the court to rule that the contracting officer here should have made some effort to discover whether indeed plaintiff intended to be bound by its timely submitted proposal. Mr. Munns sought out the names of potential suppliers at Acadiana Regional Airport prior to viewing the RFP and his agency added plaintiff to its mailing list. There were only two other companies on that list for the Acadiana Airport location. According to the testimony of plaintiff's president, Philip Devine, Messrs. Munns and Devine had a telephone conversation sometime in October 1982 (which Mr. Munns stated he did not recall) concerning the solicitation for Into-Plane

supply and service, and discussed how plaintiff might qualify as a bidder and potential contractor and how the offer package should be completed. Thus, Mr. Munns should have expected a proposal from plaintiff, and, in the interest of competition, welcomed the same.

We have noted above that the face sheet of the proposal did not contain the requested signature in box # 13, but it did in fact contain in box # 12 the typewritten names "Philip J. Devine" and "Edward G. Matula." Both names were also typewritten, together with telephone numbers, in section B33 in the offer package. These typewritten names did not precisely satisfy the requirements of DAR § 2–405(iii)(A) and (B) as indications that the offeror intended to bind itself by competent authority, but, in view of Mr. Munns' prior efforts to attract bidders at the Acadiana location, and his and the Government's prior contact with Mr. Devine, they were certainly enough to apprise him of plaintiff's probable intent to be bound by its proposal.

Mr. Munns' unreasonableness toward plaintiff's timely offer was accented by the fact that he apparently gave no significance to the letter he received from the military supervisor at Acadiana Airport indicating plaintiff's superior performance over its potential competitors in supplying fuel.

The evidence also indicates that without consideration of plaintiff's proposal, there would be little or no competition for the Into-plane contract at the Acadiana location. In view of the fact that, according to Mr. Munns himself, there were only 75 offers submitted on a total of 54 of the 70 airport locations listed on the solicitation, it is apparent that there was not much competition under the solicitation at large. These factors, in combination with the others outlined above, strongly point to a duty on the part of the contracting officer here, to make an effort to clarify plaintiff's position and to permit correction of the omission, in the interest of creating competition in what is apparently a non-competitive solicitation. The court believes that in the totality of the circumstances outlined above the contract-

ing officer's summary rejection of plaintiff's package was not required by the DAR, but was in fact clearly arbitrary and therefore an abuse of his discretion.

The Government argued strenuously at the close of trial that the relaxation of the signature rule as contemplated herein would seriously undermine the integrity and impartiality of the Government's bidding system, opening a "Pandora's box" of bogus bidders and bidders seeking to obtain unfair advantage over the Government and their competitors. Defendant's counsel also suggested that even the duty imposed on the contracting officer herein to inquire of this offeror whether it intended to be bound portends innumerable future difficulties for this agency and the entire Government bidding process. The defendant's arguments, however, are unconvincing. Mr. Munns' testimony was quite explicit that he could envision no harm to the Government in the present procurement had he telephoned plaintiff's president to inquire about the omitted signature on plaintiff's timely proposal. He also stated that receipt of unsigned proposals is rare.

In *Murdock, Inc.,* 48 Comp.Gen. 801 (1969), the Comptroller General had occasion to approve consideration of a contract bid which was submitted unsigned by an authorized person, and which the bidder sought to correct, as here, after the deadline for submission of bids had passed. The case arose under a formally advertised procurement and the unsigned bid was the only bid received at the time it was opened, another being accepted later on account of excusable delay in the mail. The lack of signature on the first bid, however, was considered a correctable error under DAR § 2–405 because the circumstances indicated that the first bidder intended to be bound by its bid and no unfair advantage could have been gained by ascertaining that fact after the bid opening, the other bid having not yet been received. *Murdock, Inc.* is analogous to the instant situation insofar as the concern for one offeror gaining a competitive advantage over another is involved and the court finds its rationale to have application herein.

Lastly, the court would note that plaintiff certified itself on its proposal as a small business concern within the meaning of the RFP in issue and the Government has an established policy to provide the "maximum practicable opportunity" for small businesses to participate in the performance of contracts. The contracting officer did nothing to further that interest here.

This court has no intention to open a "Pandora's box" of unsigned bids in the Government procurement process and we wish to emphasize that our holding in this matter applies to its peculiar facts. Given those facts and the peculiar circumstances in which this plaintiff finds itself, the court believes that the failure of the contracting officer to ascertain whether plaintiff intended to be bound by its proposal was arbitrary and unreasonable, therefore an abuse of his discretion, and contrary to the overriding public interest to foster competition in Government procurement.

### CONCLUSION

In view of the foregoing it is the order of this court that the defendant, including the contracting officer, is permanently enjoined:

(a) against considering any proposal, with respect to Negotiated RFP DLA600–83–R–0002, from any entity unless and until plaintiff's proposal filed in November 1982 has been accepted, and fully and fairly considered and reviewed by the DFSC; and

(b) from awarding a contract under Negotiated RFP DLA600–83–R–0002 to any entity unless and until plaintiff's proposal filed in November 1982 has been accepted, and fully and fairly considered and reviewed by the DFSC.

Additionally, it is the judgment of this court and it hereby declares that given the unique facts in this case neither DAR § 3–805.5 nor DAR § 2–405 require that plaintiff be barred from consideration, competition for, and receipt of an award of the Into-Plane fuel supply contract for the Acadiana Regional Airport.

It should be emphasized that nothing in this opinion may be construed to suggest that plaintiff is entitled to the award of subject contract.

IT IS SO ORDERED.