**PAXSON ELECTRIC COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 591–86C.

United States Claims Court.

April 13, 1988.

Thomas Richelo, Atlanta, Ga., for plaintiff.

Howard Lipper, with whom were Asst. Atty. Gen. John R. Bolton, David M. Cohen, Director, and Thomas W. Petersen, Asst. Director, Washington, D.C., for defendant. Larry Lippolis, Dept. of the Navy, of counsel.

## OPINION

ANDEWELT, Judge.

In this Government contract action, plaintiff, Paxson Electric Company, Inc. (Paxson), seeks to recover its bid preparation costs in connection with an unsuccessful effort to secure a contract from the Naval Facilities Engineering Command, TRIDENT (the Navy). Plaintiff contends that the selection official's decision to award the contract to another firm was arbitrary and capricious, and that the Navy violated controlling regulations when it failed in its Request for Proposals (RFP) to list the applicable bid proposal elements (technical, price, and management) in order of relative importance. The action is presently before the Court on defendant's motion for summary judgment. For the reasons set forth herein, defendant's motion is granted and the complaint will be dismissed.

### Facts [1]

#### A. The Procurement

The procurement at issue covers the design and provision of a computerized operation control system known as a Supervisory Control and Data Acquisition (SCADA) system. The SCADA system is intended to monitor and control the electrical power distribution system, street traffic lights, and sewer system at a Naval Submarine Base being constructed in Kings Bay, Georgia, for the TRIDENT submarine fleet.

The first public notice of the procurement, issued on January 10, 1985, estimated that the SCADA system would cost between $1,000,000 and $5,000,000. The RFP, issued on April 1, 1985, solicited proposals for a firm fixed price contract. The procurement was conducted by competitive negotiation, pursuant to Part 15 of the Federal Acquisition Regulations (FAR), 48 C.F.R. § 15 (1985).[2] Section M of the RFP, entitled Evaluation and Award, sets forth the method by which the proposals were to be evaluated and the terms upon which an award was to be made. Section M, in pertinent part, provides:

1. EVALUATION

1.1 The Government will establish a Board to conduct an evaluation of each proposal received. The Board will consist of technical and procurement personnel. The evaluation will be based exclusively on the content of the proposal,

---

**1.** The facts set forth in this section are undisputed.

**2.** FAR 15.102, 48 C.F.R. 15.102 (1985), provides:

Negotiation is a procedure that includes the receipt of proposals from offerors, permits bargaining, and usually affords an opportunity to revise their offers before award of a contract. Bargaining—in the sense of discussion, persuasion, alteration of initial assumptions and positions, and give-and-take—may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract.

[and] any subsequent negotiations required to clarify the proposals....

\* \* \* \* \* \*

1.3 Those proposals which have been properly submitted will be evaluated to determine a competitive range. The relative order of importance of each element of a proposal will be as follows:

Technical

Price

Management

2. AWARD

Once the competitive range is established, an award may be made to that offeror whose proposal is deemed to be the most favorable to the Government.... Following receipt of the best and final offers, each received offer will [be] evaluated and an award will be made to that offeror whose proposal is deemed to be the most favorable to the Government.

An internal Proposal Evaluation Plan (the Plan), which was designated "FOR OFFICIAL USE ONLY," set forth the following point scores and relative weights to be assigned to the proposal elements referenced in Section M of the RFP:

The overall evaluation will include a possible maximum of 10,000 points total in the following three areas:

| Area | Percentage | Points |
|------|-----------|--------|
| Technical | 45 | 4,500 |
| Price | 45 | 4,500 |
| Management | 10 | 1,000 |

The Plan stresses that the award should not necessarily be based solely on the resultant numerical scores. In this regard, the Plan states:

The evaluations of the technical and management factors will be based on the subjective evaluation of the Board members. Because these are subjective evaluations and the price evaluation will be objective, there is no requirement that the Board combine all the numerical scores to arrive at a recommendation for award. The numerical scores derived in accordance with Section 5 [containing guidelines for evaluating price proposals] should be used in the Board's deliberation to arrive at the award recommendation, but should not limit the Board looking at the entire proposal to determine their recommendation for award.

Section 4 of the Plan, entitled "Technical Evaluation," sets forth evaluation guidelines for the technical aspects of the proposals. Section 4 reiterates that the technical evaluation is subjective, and that its purpose is to determine how well each proposer responded to the requirements of the RFP. Section 4 also provides that the technical aspects of each proposal shall be broken down into elements and subelements which shall then be rated by an evaluation team. The ratings were to range between zero and one, and a raw technical score was then to be calculated from those ratings. A rating of 0.8 to 1.0 would indicate that the element exceeds the requirements of the RFP, a rating of 0.5 to 0.7 would indicate that the element meets such requirements, a rating of 0.1 to 0.3 would indicate that the element fails to meet the requirements, and a rating of zero would indicate that the element is unacceptable.

Section 5 of the Plan, entitled "Pricing Evaluation," provides that the pricing evaluation may, but need not, be numerically scored (*i.e.*, may be scored "at the option of the ... Board") and that:

The pricing evaluation is based on the premise that the lowest proposal is most advantageous to the Navy. The pricing proposal will be used as a standard against which to judge the value of the technical proposal, and not as an addition to the cumulative score of the overall evaluation.

Four firms submitted proposals in response to the RFP, but one firm subsequently withdrew its proposal and another firm's proposal was later eliminated for being outside the competitive range. Written negotiations were conducted with the two remaining bidders, plaintiff and Engineering Design Group, Inc. (EDG). In letters dated July 6, 1985, the Navy advised both Paxson and EDG that their prices appeared high, and requested that they submit proposed modifications on more favorable terms. In a July 19, 1985, letter, Paxson defended its price, stating that its

proposed systems were "the best available to the Navy and in many instances far exceed the requirements of the specifications." On July 30, 1985, Paxson reduced its price, but the Navy again responded that Paxson's price appeared high. Paxson further reduced its price to $7,737,934 in its best and final offer, which was submitted on September 3, 1985. EDG's best and final offer, which was also submitted on that day, specified a price of $5,998,170. Paxson's final price, therefore, was over 27 percent higher than EDG's price.

## B. The Award to EDG

The two proposals were evaluated by a Board established pursuant to the RFP. Upon completion of its evaluation, the Board forwarded to the selecting official, Captain James M. Greenwald, a package of documents that included a narrative discussion of the proposals, the raw point score calculated for each element of each proposal, and a memorandum summarizing the results of the negotiations. The Board concluded that both firms had submitted proposals that were acceptable to the Government in the technical and management categories, with Paxson having the superior technical rating, and EDG the superior management rating. The Board did not, however, add up the raw scores, nor did it make a recommendation as to which of the two firms should be awarded the contract.

The following are the raw scores determined by the Board, and the sums of those scores:

| OFFEROR | PRICE (45%) | TECHNICAL (45%) | MANAGEMENT (10%) | TOTAL |
|---|---|---|---|---|
| EDG | 4,500 | 2,615 | 1,000 | 8,115 |
| Paxson | 3,488 | 4,500 | 702 | 8,690 |

Although Paxson received a higher overall numerical score, on September 30, 1985, Captain Greenwald awarded the contract to EDG. Captain Greenwald detailed his rationale for his decision in an award memorandum dated September 12, 1985. In that memorandum, Captain Greenwald concluded that, under the criteria applied in the evaluation, the two proposals were "virtually equal overall" and, therefore, he decided to use price "as a basis of breaking the tie or tipping the scale." Captain Greenwald also listed a series of points "especially pertinent" to his decision, including that EDG's proposal "was determined to have met the minimum requirements of the technical specification in all respects and to be technically sufficient and satisfactory," and that EDG's proposal was within 6.6 percent of Paxson's proposal in total point score (8,115 for EDG v. 8,690 for Paxson), had a "very high" management score, and was substantially lower in price.

In his award memorandum, Captain Greenwald, in effect, questioned the Board's assignment of very low raw scores for certain elements of EDG's technical proposal, and very high scores for certain elements of Paxson's technical proposal. With respect to EDG's proposal, the award memorandum states that, in view of the Board's conclusion that EDG's proposal was "completely adequate technically," the Board erred in giving EDG a raw score of zero on certain technical items. With respect to Paxson's technical proposal, the memorandum states that the Board erred in giving Paxson a raw score of 1.0 with respect to certain elements because Paxson's bid included "over power or excess capability, [which,] although nice to have and beneficial, should not be given excess weight in the technical comparison." In addition, in his award memorandum, Captain Greenwald explained that he did not ask the Board to requantify the suspect ratings in view of these apparent errors, "but used them only as they tend to further illustrate that what are already very close overall proposals are probably even closer to equal."

## C. Post–Award Challenge by Paxson

Paxson was notified of the award to EDG in an October 1, 1985, letter. The letter states that, although Paxson's proposal was considered technically adequate, the primary reason that it was not selected was the substantial difference in price. After receiving a formal debriefing from the Navy, Paxson filed a bid protest with the General Accounting Office (GAO) on October 17, 1985. On December 17, 1985, prior to any decision on the protest by GAO, Paxson filed a complaint in the United

States District Court for the Southern District of Georgia, seeking to preclude procurement of the SCADA system from EDG. On December 20, 1985, the district court denied Paxson's motion for a Temporary Restraining Order and a Preliminary Injunction, and asked GAO for an advisory opinion. In a February 3, 1986, advisory opinion, GAO denied Paxson's protest on the merits, concluding that "the Navy acted reasonably in awarding to the proposal that came closest to its budgetary limitations and which was technically acceptable."

The district court thereupon transferred Paxson's request for bid preparation costs to this Court. Defendant filed the instant motion for summary judgment on June 10, 1987. In support of its motion, defendant submitted an affidavit from Captain Greenwald. Captain Greenwald's affidavit is consistent with his award memorandum and explains in detail his rationale for awarding the contract to EDG. In the affidavit, Captain Greenwald summarizes his decision to award the contract to EDG as follows:

> In summary, I was faced with two very acceptable proposals. One of them [Paxson's] was technically superior to the other, but the management rating was inferior, and carried a heavy price penalty. All factors considered, I decided the proposals to be essentially equal. Therefore, I decided that it would be in the best interests of the government to take the lower price offer. Stated somewhat differently, I did not reach the conclusion that the value to the government of the technical superiority of the Paxson proposal was worth the additional cost to the government.

Greenwald Affidavit, para. 14.

### Discussion

■ When the Government solicits and receives bids for a contract, an implied-in-fact contractual obligation arises to give fair and honest consideration to each bid that is submitted. *Heyer Prod. Co. v. United States*, 135 Ct.Cl. 63, 69, 140 F.Supp. 409, 412 (1956); *La Strada Inn, Inc. v. United States*, 12 Cl.Ct. 110, 112–13

(1987); *Rockwell Int'l Corp. v. United States*, 8 Cl.Ct. 662, 663 (1985). An unsuccessful bidder can secure its bid preparation costs in this Court if it can demonstrate a breach of that contractual obligation. *La Strada Inn*, 12 Cl.Ct. at 112–13; *Kinetic Structures Corp. v. United States*, 6 Cl.Ct. 387, 396 (1984); *Space Age Eng'g, Inc. v. United States*, 4 Cl.Ct. 739, 741 (1984). The standard of proof, however, is stringent in that the bidder must demonstrate by "clear and convincing proof" that the action taken by the Government in awarding the contract to another was arbitrary and capricious. *Heyer Prod.*, 135 Ct.Cl. at 71; *Kinetic Structures*, 6 Cl.Ct. at 396. *See also Tidewater Management Serv. v. United States*, 216 Ct. Cl. 69, 72, 573 F.2d 65, 67 (1978). Proof that there was "no reasonable basis" for the award decision will generally suffice to demonstrate arbitrary and capricious action. *Keco Indus. v. United States*, 203 Ct.Cl. 566, 574–75, 492 F.2d 1200, 1203–04 (1974) (*Keco II*), *after remand in* 192 Ct.Cl. 773, 428 F.2d 1233 (1970) (*Keco I*); *Continental Business Enter. v. United States*, 196 Ct.Cl. 627, 637–38, 452 F.2d 1016, 1021 (1971). Proof of a violation of pertinent statutes or regulations can, but need not necessarily, be a ground for recovery. *Keco II*, 203 Ct.Cl. at 574, 492 F.2d at 1203–04; *Kinetic Structures*, 6 Cl.Ct. at 397. *Cf. Keco I*, 192 Ct.Cl. at 784, 428 F.2d at 1240. In order to recover on this ground, the plaintiff must present evidence of a "clear and prejudicial violation of applicable statutes or regulations." *Kinetic Structures*, 6 Cl.Ct. at 394 (quoting *DeMat Air, Inc. v. United States*, 2 Cl.Ct. 197, 202 (1983)).

Plaintiff here contends that it was denied the required fair and honest consideration of its bid in two ways. First, plaintiff contends, in effect, that in awarding the contract to EDG, Captain Greenwald was arbitrary and abused the discretion allowed him under the award procedures established in the RFP and the Evaluation Plan. Second, plaintiff contends that the Navy violated applicable procurement regulations by listing "technical" above "price" in the

RFP when the Evaluation Plan provided that the two elements were to be given equal weight.

### A. Consistency of the Award with the Provisions of the RFP and the Evaluation Plan

■ As described above, in his award memorandum and affidavit, Captain Greenwald explains in detail the procedures and analysis that resulted in the contract award to EDG. In sum, since Captain Greenwald considered the two bids to be essentially equal, he performed a technical/price tradeoff and concluded that the technical superiority of plaintiff's proposal simply was not worth the extra $1.7 million in price.

Paxson first argues that Captain Greenwald's approach was violative of the guidelines set forth in the RFP and Evaluation Plan, since Paxson's proposal received both a higher total numerical score (by 6.6 percent) and a higher technical score (by 72 percent). These advantages, Paxson argues, were improperly traded off for a savings of only 27 percent in price. According to Paxson, Captain Greenwald was obligated to select the proposal that received the highest total score, and, in any event, Paxson's offer "was definitely a bargain the Navy should prefer."

But the RFP does not indicate that the award shall be given to the firm with the highest overall rating. Rather, the RFP provides that the award will be made "to the offeror whose proposal is deemed to be most favorable to the Government." Except for listing the relative order of importance of the three proposal elements (technical, price, and management), the RFP does not indicate how the competing proposals will be evaluated to determine which is most favorable to the Government. The RFP thereby provides the selecting official with reasonably broad discretion, consistent with the relative ranking of the proposal elements, to make the award based on technical/price tradeoffs among the competing proposals.

The Evaluation Plan, unlike the RFP, establishes a procedure for assigning numerical scores to the three proposal elements. But, like the RFP, the Plan does not contemplate that an award will necessarily be made to the proposal that receives the highest total numerical score. On the contrary, the Plan specifically rejects such a purely numerical approach, stressing that, while the price evaluation is objective, the technical evaluation is subjective. According to the Plan, "there is no requirement that the Board combine all numerical scores to arrive at a recommendation for award," and "the pricing proposal will be used as a standard against which to judge the value of the technical proposal and not as an addition to the cumulative score of the overall evaluation."

Captain Greenwald explains in his affidavit that the Plan was drafted in this way precisely to permit an exercise of independent judgment by the selecting official as to whether any technical advantages are worth the extra cost to the Government. In this regard, the Greenwald affidavit, at para. 7, states:

> We prepared the evaluation plan in such a manner ... to force the [Board] and later myself as selecting authority, to decide whether the technical merits of the proposal were worth the dollar value attached to it. I recognized throughout the proposal preparation phase that a point scoring system could be useful in assisting me to decide which proposer offered the proposal most favorable to the government, but I also realized that I could not allow the point scores, by themselves, to serve as a substitute for my independent judgment.

Contrary to plaintiff's contentions, therefore, the RFP and the Evaluation Plan permit the selecting official to make the type of technical/price tradeoff that Captain Greenwald performed. These documents did not require that he grant the contract to Paxson simply because its proposal received a higher overall score and a higher score for technical merit.

Plaintiff relies primarily upon two procurement decisions to support its contentions to the contrary, but neither is availing. First, in *Harrison Systems, Ltd.*, 63

Comp.Gen. 379 (1984), unlike the instant case, the RFP specifically provided that the award would be made to the offeror achieving the highest combined score. The RFP thereby restricted the selecting official's discretion in a manner not involved here.

Next, in *Dalfi, Inc.*, 87–1 B.C.A. (CCH) para. 19,552 (1986), as in the instant case, the RFP provided that technical merit would be the most important element in evaluating the competing proposals. The selection official awarded the contract to the low-price bidder, notwithstanding the fact that another bidder's proposal had received a higher technical rating. The bidder with the higher rated technical proposal filed a protest, which the Board of Contract Appeals allowed, citing a series of deficiencies in the award procedures. On remand, however, the selecting official again awarded the contract to the low bidder, concluding that the technical advantages of the protestor's proposal simply were not worth the increased price.

This led to a second protest, which the Board of Contract Appeals denied. *Dalfi, Inc.*, 87–3 B.C.A. (CCH) para. 20,018 (1987). The Board this time focused on the general standard in the RFP that "[a]ward of the contract resulting from this solicitation will be made to the offeror whose proposal offers the greatest value to the Government in terms of technical capability and which proposal offers the greatest value to the Government." *Id.* at p. 101,356. The Board concluded that notwithstanding the statement in the RFP that technical merit was more important than price, the above-quoted general standard "reserves to the respondent great discretion in awarding the contract," and "does not state the degree to which technical capabilities are of particular concern to the respondent, or what factors may enter into any technical and cost trade off." *Id.* The Board found that the technical/price tradeoff constituted a "considered judgment" that was within the discretion allowed by statute, regulation, and the terms of the solicitation. In the instant case, Captain Greenwald appears to have made the same type of considered judgment pursuant to an RFP which, in relevant part, employs a standard that vests similar discretion in the selecting official.

Next, plaintiff contends that it was arbitrary and capricious for Captain Greenwald to have concluded, without requesting a rescoring by the Board, that EDG's proposal was technically adequate and that the Board's technical ratings were too low for EDG and too high for Paxson. The record to date indicates, however, that Captain Greenwald's actions were reasonable and entirely within the range of discretion permitted him.

In his affidavit, Captain Greenwald amplifies his previous award memorandum discussion concerning his decision process as follows:

10. I spent three days carefully reviewing the proposals against the evaluations. In doing so, I quickly detected what appeared to be an anomaly between the point scoring by the advisors on the technical proposal and the narrative evaluation of those advisors. At the start of my evaluation, I was primarily concerned with insuring the proposals of both firms satisfied all the requirements of the solicitation. I was assured that they did, both in the documents that I had before me and in my conversations with the technical evaluators. However, the points assigned to EDG in many categories of its technical proposal seemed rather low. In one or two cases they received zeros; in a number of other cases they received ones on a scale from zero to ten. Based on the way the evaluation plan established the numbers to be assigned each sub element in the evaluation factors, a number between zero and three tended to indicate proposer did not meet the evaluation criteria for some reason. Thus, on the one hand, the narrative analyses indicated EDG met the requirements of the specification in these areas, but the numerical scores indicated they did not.

11. I spoke to my technical advisors about this problem. I probed them to insure that their statements that the EDG proposal satisfied the requirements

of the solicitation were accurate. They assured me that they were. I then questioned them on their assignment of points and determined that they were not applying the points in accordance with the evaluation plan criteria. The plan required that when a proposer satisfied a requirement, he should be given at least a score of three, and more likely a score of five. Based on my analysis and discussions, I concluded that the points assigned to the EDG proposal were low and not completely reflective of the quality of the proposal.

12. I also had some problems with the Paxson proposal at the other end of the scale. I noted that in a number of cases Paxson received the maximum possible points in an evaluation subfactor. Paxson appeared to have achieved this result by offering to provide equipment that had much greater capacity than we needed given the size of the systems that would be employed on this base. I concluded that this 'excess capacity' could be very desirable in some applications, but it was not particularly useful for the Kings Bay Submarine Base. I concluded that one of the reasons Paxson's price proposal was so much higher than the government estimate and EDG's proposal was that it was offering to provide a great deal of excess capacity in its hardware. Therefore I determined that the price penalty to be paid for this excess technical capacity was not in the best interests of the government and that the Paxson technical proposal point scores could be considered a little high.

This approach appears fair, reasonable, and otherwise consistent with the procedures established in the relevant documents. In the factual context which he confronted, especially in view of the Board's having consistently taken the position that EDG's proposal was technically adequate, Captain Greenwald's reliance upon his own analysis and informal discus-sions with Board members, and his decision to refrain from asking the Board for a formal rescoring of the technical ratings of the two proposals appear reasonable.

**B. Defendant's Failure to List Properly the Relative Order of Importance of the Evaluation Factors in the RFP**

Plaintiff next contends that it is entitled to its bid preparation costs because the RFP erroneously lists "technical" above "price" in order of importance when in fact they were of equal importance under the Evaluation Plan. Plaintiff alleges that this is a *per se* violation of FAR 15.406–5(c), 48 C.F.R. § 15.406–5(c) (1985), which provides that the contracting officer must specify the significant evaluation factors and the relative importance the Government places on those factors.[3]

█ Plaintiff is correct in its allegation that the RFP was drafted in a manner inconsistent with the requirements of FAR 15.406–5(c). In his affidavit, Captain Greenwald explains his rationale for listing of the elements in the RFP as follows: "Since price and technical factors were rated equally, we decided it did not matter which appeared first." But contrary to Captain Greenwald's perception, by listing "technical" above "price," the RFP incorrectly suggests that technical merit was more important than price.

But not every such violation of applicable regulations warrants an award of bid preparation costs. *See Keco II,* 203 Ct.Cl. at 574. Here, defendant's error in the RFP with respect to the order in which the proposal elements were listed does not constitute a violation of the requirement that plaintiff's proposal be "fairly and honestly" considered. *See Keco I,* 192 Ct.Cl. at 784, 428 F.2d at 1233; *Heyer Prod.,* 135 Ct.Cl. at 69. Plaintiff simply has failed to establish that it was materially misled or otherwise prejudiced by the violation found here.

---

**3.** Plaintiff similarly alleges that the order in which the elements in the RFP are listed is inconsistent with a Navy handbook prepared to aid Navy personnel in procurement activities relating to the Kings Bay base. The handbook, entitled "Competitive Negotiation Handbook," provides in Part V that evaluation factors shall be established and their relative importance stated. Thus, the handbook essentially follows the provisions of FAR 15.406–5(c).

*See Kinetic Structures*, 6 Cl.Ct. at 394; *DeMat Air, Inc.*, 2 Cl.Ct. at 202.

The RFP indicates that the award would be made to the proposal that was "most favorable" to the Government. It purports to list only the relative order of importance of the three proposal elements, and does not set forth the absolute weights which were to be given to each such element during the evaluation process. The RFP thus would have been entirely consistent with the RFP listing to weigh technical factors only slightly more than price, *e.g.*, 46 percent technical, 44 percent price, and 10 percent management, or, in the alternative, to give roughly equal weight to all of the three evaluation elements, *e.g.*, 35 percent technical, 33 percent price, and 32 percent management. Under the first alternative, Paxson's and EDG's total scores would not have been materially changed from what they were under the rating system set forth in the Evaluation Plan, and under the second alternative, EDG would have received a higher total numerical score than Paxson. Under either alternative, it would have been reasonable for Captain Greenwald to have selected EDG's proposal. Hence, plaintiff was not prejudiced by the order in which the proposal elements were listed. When preparing and presenting its proposal in response to the RFP, plaintiff simply had no reason to assume that it would be selected if, as turned out to be the case, its proposal was technically superior to a competing proposal but inferior with respect to management and price.

Indeed, the RFP notwithstanding, plaintiff had fair warning that it might not receive the award because its price was too high. Plaintiff was on notice that the Navy expected the procurement to cost between $1–5 million, and was repeatedly encouraged to lower its price during the written negotiations. Yet its final price was over $2.7 million more than the maximum $5 million estimate. In this overall factual context, any error in the ordered listing of the evaluation elements, while unfortunate and certainly to be discouraged, did not prejudice plaintiff and does not support the award of bid preparation costs.

## C. The Absence of Any Genuine Issue of Material Fact

Summary judgment under RUSCC 56 is appropriately granted only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed. 2d 265 (1986), and all significant doubt as to the existence of factual issues must be resolved in favor of the party opposing summary judgment. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed.Cir.1985). However, once the moving party has met its burden, the non-movant "must proffer countering evidence sufficient to create a genuine factual dispute." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir. 1987). In *Sweats Fashions*, the Court of Appeals for the Federal Circuit discussed the non-moving party's burden as follows:

> In countering a motion for summary judgment, more is required than mere assertions of counsel. The non-movant may not rest on its conclusory pleadings but, under Rule 56, must set out, usually in an affidavit from one with personal knowledge of specific facts, what specific evidence could be offered at trial.

*Id.* at 1562–63 (quoting *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984).

Defendant here has met its initial burden in its motion for summary judgment. It has submitted Proposed Findings of Uncontroverted Fact that are supported by, *inter alia*, the RFP, the Evaluation Plan, and Captain Greenwald's award memorandum and affidavit. For the reasons set forth above, the documents of record indicate that plaintiff's bid received fair and honest consideration. Since defendant's filings demonstrate the absence of any genuine

issue of material fact and that it is entitled to judgment as a matter of law, the burden shifts to plaintiff to point to "specific evidence" sufficient to create a genuine factual dispute. *Sweats Fashions*, 833 F.2d at 1562–63. Plaintiff has failed to meet that burden.

In connection with its response to defendant's motion, plaintiff submitted a Statement of Genuine Issues and its own Proposed Findings of Uncontroverted Fact. However, in neither of these documents does plaintiff point to any evidence tending to dispute the facts that are material to defendant's motion, which are set forth in the factual statement in this opinion. In its Statement of Genuine Issues, plaintiff, in essence, simply expresses its disagreement with defendant as to the proper interpretation of the provisions of the RFP and the Evaluation Plan, and as to the reasonableness of Captain Greenwald's actions. But mere legal arguments of counsel are ineffective to raise a genuine issue of material fact. *Id.* Plaintiff's Proposed Findings of Uncontroverted Fact consists of nothing more than a list of "critical fact issues," an example of which is as follows:

(1) Whether the zero scores obtained by EDG on portions of its technical proposal pertain to aspects of the project of such importance that the conclusion that EDG's proposal was technically adequate was itself arbitrary and capricious.

Plaintiff's position with respect to each of these issues has been either implicitly or explicitly rejected in the preceding portions of this opinion. Moreover, contrary to the requirements of RUSCC 56(d), plaintiff's Proposed Findings of Uncontroverted Fact do not contain a single citation to the pleadings or to the documentary evidence of record. They are thus ineffective to demonstrate the existence of a genuine issue of material fact. See *Sweats Fashions,* 833 F.2d at 1562–63.

### Conclusion

For the foregoing reasons defendant's motion for summary judgment is granted,

and the Clerk of the Court shall dismiss the complaint. No costs.

IT IS SO ORDERED.