*826 TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos el recurrente, Redondo Waste Systems, Inc. (en lo sucesivo Redondo) solicitando que dejemos sin efecto la resolución que emitiera la Junta de Calidad Ambiental (la Junta), por voz del Juez Administrativo Ramón Negrón Soto, el 24 de marzo de 2006. Confirmamos.
Los hechos relevantes al caso ante nos son los siguientes.
I
Según las determinaciones de la Junta, Redondo, haciendo negocios como Celsius, es una corporación debidamente registrada y autorizada para hacer negocios en Puerto Rico que se dedica a transportar, almacenar y procesar desperdicios sólidos bioquímicos y no peligrosos, mediante incineración. Dicha corporación opera dos instalaciones, una que se dedica a la incineración de desperdicios y otra de tratamiento y destrucción de los desperdicios biomédicos regulados (DBR). [1]
Celsius poseía los siguientes permisos: (1) permiso para operar la instalación de desperdicios sólidos no peligrosos que expiró en marzo de 2002, por lo que solicitó su renovación en enero de 2002; (2) permiso para la recolección y transportación de desperdicios no peligrosos, que vence en junio de. 2007; (3) permiso para la operación de una fuente de emisión y un sistema de incineración de desperdicios sólidos no peligrosos bajo el Título V, Parte VI del Reglamento de la Contaminación Atmosférica, aprobado por la Junta, [2] que venció en agosto de 2005. Celsius continuó operando bajo este último permiso.
Como resultado del establecimiento de nuevas guías para incineradores médico-hospitalarios por parte de la Enviromental Protection Agency (EPA), Celsius adquirió una tecnología alterna para reducir las emisiones de plástico. Además, se acogió a un plan de cumplimiento que le requería someter informes periódicos. Este permiso de emisión prohibía la incineración de desperdicios plásticos que contuvieran PVC. Posteriormente, la Junta modificó el permiso para construir la fuente de emisión que originalmente le había otorgado a Redondo, ello con el propósito de cambiar la operación actual a incineración de quema combinada.
Así las cosas, el 14 de febrero de 2002, personal técnico de la Junta acudió a las facilidades de Celsius para inspeccionar y verificar el cumplimiento con las leyes y reglamentos aplicables. Durante la inspección se observó lo siguiente:

En el Área de Almacén: (1) bolsas plásticas de color rojo, identificadas como desperdicios biomédicos regulados (DBR) estaban amontonadas unas sobre otras, sin ningún orden, sin indicar la fecha de empaque o de transportación, ni el tipo de desperdicio en su contenido; (2) bolsas plásticas de color rojo, identificadas con DBR, rotas, alrededor de las cuales se observó la presencia de vectores, tales como moscas y mimes; (3) en el piso se observaron desperdicios sólidos (papeles, hojas) mezclados con desperdicios biomédicos (guantes y jeringuillas); (4) recipientes utilizados para desperdicios patológicos vacíos sin limpiar, alrededor de los cuales se observó la presencia de moscas; (5) olores desagradables y a podrido.

*827
En el Área del Incinerador: (1) recipientes vacíos y recipientes conteniendo DBR, algunos de los cuales estaban abiertos o rotos (cajas) dejando los desperdicios expuestos al aire y al agua, ya que se encontraban en un área abierta; (2) dos recipientes con desperdicios incinerados, entre los que se podían reconocer sueros con sus líneas, jeringuillas, contenedores de desperdicios punzantes, desperdicios patológicos chamuscados o prácticamente intactos y bolsas plásticas sin destruir completamente; (3) desperdicios incinerados en el suelo; (4) drenajes conteniendo agua mezclada con todo tipo de desperdicios, de apariencia negra y nauseabunda, (5) olores desagradables y a podrido.

En el Área de la Ojicina: (1) se revisó la copia original de manifiestos del 11 al 13 de febrero de 2002, manifiestos de diciembre de 2001, de enero y febrero de 2002. Según personal de Celsius, el manifiesto original^ se le devuelve al generador junto a la factura que incluye una certificación de incineración; (2) se le solicitó copia del manifiesto 218706, el cual fue utilizado para transportar unas bolsas observadas en el almacén con desperdicios DBR y pertenecientes al Hospital San Pablo de Bayamón; (3) el 15 de febrero de 2002, la Junta revisó en el Hospital San Pablo de Bayamón copia del manifiesto 218706 y encontró unido a éste una certificación de Celsius indicando que los desperdicios habían sido destruidos.

El 16 de febrero de 2002, la Junta recibió copia de una carta suscrita por el señor José Soto, Gerente de Relleno Sanitario, de la compañía Waste Management que operaba en el Barrio Buena Vista de Humacao, mediante la cual le notificaba a Celsius que tuvo que rechazar su camión, conteniendo supuestamente cenizas, porque el contenido no correspondía con la descripción provista de los desperdicios.
El 26 de marzo de 2002, la Junta realizó una reinspección de Celsius para verificar si se habían corregido las deficiencias antes encontradas en febrero de ese año. En dicha ocasión se encontraron que las violaciones antes reseñadas no fueron corregidas y que además se observaron las siguientes: (1) ausencia de paletas de madera u otros recipientes similares para el recibimiento de desperdicios; (2) almacenamiento de desperdicios patológicos sin mantenerse refrigerados; (3) descarga de agua del incinerador que iba al terreno, y (4) el personal que manejaba los desperdicios no contaba con protectores transparentes para la cara, ni guantes especiales resistentes a objetos punzantes y cortantes.
En cuanto al Programa de Calidad de Aire, la Junta encontró que continuaban las siguientes violaciones: (1) no contaban con un Plan de Emergencia; (2) no notificaron la pérdida de material refractario en la coraza de la cámara primaria ocurrido el 10 de enero de 2002; (3) no cumplieron con los parámetros operacionales descritos, pues no llevaban un registro de la razón de incineración para demostrar su cumplimiento con el límite de 1,680 lb./hr., observándose temperatura menores de 1,460° F en la cámara primaria y temperaturas menores de 1,700 F en la cámara secundaria hasta el 11 de enero de 2002; (4) no proveer almacenaje adecuado según requerido por lo que se observaron desperdicios biomédicos con objetos filosos abiertos y gran cantidad de vectores; (5) no instalaron el sistema de pesaje o balanza para llevar la contabilización de las libras cargadas al incinerador; (6) no instalaron el medidor de opacidad en la chimenea de incinerador; (7) no realizaron lecturas de emisiones visibles requeridas. Todo ello en violación del Reglamento para el Manejo de Desperdicios No Peligrosos (Reglamento Núm. 5717); del Reglamento para el Control de la Contaminación Atmosférica del Estado Libre Asociado de Puerto Rico (Reglamento Núm. 5300) y de su propio Manual de Operaciones.
Luego de celebradas varias vistas administrativas, la Junta emitió la resolución recurrida mediante la cual le impuso a Celsius multas que totalizan $85,000.00 por las violaciones antes reseñadas. Oportunamente, el representante del interés público presentó una solicitud de reconsideración. Dicha reconsideración fue acogida, emitiéndose resolución final el 21 de agosto de 2006.
Inconforme, Redondo acude ante nos planteando que incidió la Junta al entender que tiene facultad para reglamentar los desperdicios biomédicos regulados; al nombrar un juez administrativo a pesar de que la Ley Sobre Política Pública Ambiental sólo reconoce a los Oficiales Examinadores o al Panel Examinador como *828 funcionario adjudicativo; la resolución recurrida es nula o defectuosa; la prueba presentada y aceptada no se configuraron actos que violen los Reglamentos Núm. 5717 y 5300; al emitir una querella administrativa por violaciones al Reglamento 5300 cuando Redondo se encontraba operando bajo un plan de cumplimiento.
Este Tribunal le concedió un plazo a la Junta para que presentara su alegato en oposición. Con el beneficio de su comparecencia, atendemos el presente recurso.
II
En Puerto Rico la Ley Ambiental tiene como fin: (1) establecer una política pública que estimule una deseable y conveniente armonía entre el hombre y su medio ambiente; (2) fomentar los esfuerzos que impedirían o eliminarían daños al ambiente y a la biosfera y estimular la salud y el bienestar del hombre; (3) enriquecer la comprensión de los sistemas ecológicos y fuentes naturales importantes para Puerto Rico, y (4) establecer la Junta. 12 L.P.R.A. § 1122. La Ley Ambiental creó la Junta entre cuyas facultades y deberes se encuentra el adoptar, promulgar, enmendar y derogar reglas y reglamentos para la disposición de desperdicios sólidos y para fijar los sitios y métodos para la disposición de éstos, 12 L.P.R.A. § 1131(21), además de adoptar reglas y reglamentos para establecer un mecanismo de permisos y licencias que regule el control de la contaminación del aire, agua, desperdicios sólidos y ruidos, 12 L.P.R.A. § 1131(23).
La Junta también puede fijar mediante reglas y reglamentos, órdenes y acuerdos los sistemas y métodos que creyere conveniente para facilitar la recuperación y reuso de desperdicios sólidos, 12 L.P.R.A. § 1131 (34)(A), y hacer estudios e investigaciones para el desarrollo y la aplicación de nuevos métodos para la disposición de desperdicios sólidos y hacer recomendaciones y ofrecer consejo técnico sobre ello a las agencias del Gobierno Estatal, gobierno municipales y las industrias privadas, 12 L.P.R.A. § 1131 (34)(D). El Artículo 7 de la Ley de Junio 23, 1978, Núm. 70, transfirió a la Autoridad de Desperdicios Sólidos (la Autoridad) los poderes, facultades y funciones de la Junta conferidas en estos dos últimos incisos; es decir, la Autoridad es hoy día la agencia que se encarga de recuperación y reuso de desperdicios sólidos. Entre sus facultades, la Autoridad tiene el poder de planificar, financiar y operar en todo Puerto Rico los servicios de trasbordo, procesamiento) recuperación y disposición final de desperdicios sólidos para el uso de los municipios, agencias públicas y privadas 12 L P R A § 1305 (d). ' '
A su discreción, puede proveer y operar los sitios y facilidades para el procesamiento, recuperación, disposición final o almacenamiento de los desperdicios sólidos peligrosos. 12 L.P.R.A. § 1305(h). También, la Autoridad puede adoptar las reglas y reglamentos para establecer un mecanismo de permisos y licencias que controlen las actividades operacionales de recolección, trasbordo, procesamiento y recuperación de desperdicios sólidos, incluyendo los peligrosos, en armonía con las normas, reglas y requisitos establecidos por la Junta y la agencia federal conocida como el “Environmental Protection Agency” (E.P.A.), 12 L.P.R.A. § 1305(z).
La Autoridad ejercerá sus poderes en coordinación y armonía con la Junta y la Junta de Planificación en bien de los mejores intereses del Estado Libre Asociado de Puerto Rico. Ésta necesitará el permiso de la Junta para establecer y operar las facilidades de desperdicios sólidos, y para el almacenamiento, reutilización y/o disposición final de los mismos. Es importante notar que la Autoridad está obligada a cumplir con la reglamentación y política pública de la Junta y necesita el permiso de ésta para establecer, operar, almacenar y la disposición final de desperdicios sólidos. 12 L.P.R.A. § 1306.
No cabe duda que la Junta tiene facultad parar reglamentar la disposición de desperdicios sólidos y que la Autoridad viene obligada a cumplir con éstos. Igualmente, no existe duda que a la Autoridad se le delegó la facultad que la Junta poseía para fijar mediante reglas y reglamentos, órdenes y acuerdos de los sistemas y métodos que creyere conveniente para facilitar la recuperación y reuso de desperdicios sólidos, 12 L.P.R.A. § 131 (34)(A). También se le delegó el deber de hacer estudios e investigaciones para el desarrollo y la aplicación de nuevos métodos para la disposición de desperdicios sólidos y hacer recomendaciones y ofrecer consejo técnico *829 sobre ello a las agencias del Gobierno Estatal, gobierno municipales y las industrias privadas, 12 L.P.R.A. § 1131 (34)(D).
Sin embargo, mediante la aprobación de la Ley Núm. 215 de 28 de septiembre de 2006, se enmendó el Artículo 70 de la Ley Núm. 416 de 22 de septiembre de 2004, conocida como “Ley sobre Política Pública Ambiental”, a los fines de aclarar la intención legislativa y facilitar la implantación de esta Ley. En su Exposición de Motivos se estableció:

“El Artículo 70 de la Ley Núm. 416 de 22 de septiembre de 2004, conocida como “Ley Sobre Política Pública Ambiental”, no dispone claramente si el mismo sólo será aplicable a aquellas reglas y reglamentos nuevos, como parece implicar el título dado al Artículo, o si aplicará a la reglamentación vigente a la fecha de efectividad de la nueva Ley y que se pretenda que continúe su vigencia con posterioridad a dicha fecha. ”

La “Ley Sobre Política Pública Ambientar le ordena a todas las agencias, departamentos, municipios, corporaciones e instrumentalidades públicas que revisen “su autoridad estatutaria actual, sus reglamentos administrativos y su política y procedimientos corrientes” para determinar si las mismas contienen deficiencias o inconsistencias que le impidan el cumplimiento con los fines y las disposiciones de la misma. Además, ésta contiene delegaciones específicas de autoridad para reglamentar dirigidas a la Junta de Calidad Ambiental y la Autoridad de Desperdicios Sólidos. No obstante, estas disposiciones, con muy pocas excepciones, ya estaban vigentes en la Ley Núm. 9 de 18 de junio de 1970, según enmendada, la cual fue derogada y sustituida por esta nueva Ley.
Sin dudas, es conveniente y necesario que todas las agencias, departamentos, municipios, corporaciones e instrumentalidades públicas cumplan prontamente con las disposiciones y requisitos antes mencionados, mediante una revisión de todos sus reglamentos, política y procedimientos para garantizar el cumplimiento con la política pública ambiental de Puerto Rico y las restantes disposiciones de la Ley antes citada. No obstante, la preocupación mayor de la Asamblea Legislativa al aprobar la “Ley Sobre Política Pública Ambientar era asegurarse de que la reglamentación vigente, aprobada bajo la legislación anterior derogada por la nueva Ley, quedaría en pleno vigor al momento de comenzar su vigencia esta última. En segundo lugar, era el propósito legislativo que las instituciones públicas adoptasen las nuevas reglas o reglamentos necesarios, si alguno, al amparo de las disposiciones de la nueva Ley.
Sin duda, el Artículo 70 de la “Ley Sobre Política Pública Ambientar es aplicable a la nueva reglamentación que la Junta de Gobierno de la Junta de Calidad Ambiental, la Autoridad de Desperdicios Sólidos y/o las restantes instituciones públicas, deban aprobar para su implantación. No obstante, como hemos expresado antes, no surge claramente del mismo que dicho Artículo no afectará la vigencia y efectividad de la reglamentación vigente al 22 de marzo de 2005, fecha en que comenzó su vigencia la nueva Ley. Por otro lado, consideramos necesario que tanto la Junta de Calidad Ambiental y la Autoridad de Desperdicios Sólidos, como las restantes instituciones gubernamentales, dispongan de un plazo mayor para cumplir cabalmente con la encomienda de revisar sus reglas y reglamentos para armonizarlos con la política pública y otras disposiciones contenidas en la “Ley Sobre Política Pública Ambiental”.
En consecuencia, por virtud de la Ley 215, ante, se enmendó el Artículo 70 de la Ley Núm. 416 de 22 de septiembre de 2004, para que lea como sigue:

“Artículo 70.-De la nueva reglamentación y las reglas y reglamentos vigentes

Toda agencia, departamento, municipio, instrumentalidad, corporación pública que tenga jurisdicción conferida por la presente Ley y le hayan sido delegados poderes cuasi-legislativos y/o cuasi-judiciales tendrán que preparar toda nueva regla o reglamentación que resulte necesaria para la aplicación de la misma, de manera tal que éstas puedan ser aprobadas y adquieran eficacia jurídica dentro de los primeros veinticuatro (24) meses de entrar en vigor esta Ley. Esta disposición no afectará la validez ni la vigencia de toda regla o reglamentación adoptada antes de la fecha de vigencia de esta Ley, al amparo de las disposiciones de *830 cualesquiera de las leyes derogadas por la misma. ” [Énfasis nuestro.]
Así pues, por mandato de ley sigue vigente, toda la reglamentación adoptada por la Junta aplicable al caso de autos, es decir, el Reglamento Núm. 5717, ante; Reglamento Núm. 5300, ante; y Reglas de Procedimiento de Vistas Administrativas de la Junta de Calidad Ambiental de Puerto Rico (Reglamento Núm. 3672).
m
En el caso de autos, Redondo argumenta que no habiendo delegado la Legislatura poder a la Junta para reglamentar los desperdicios sólidos no peligrosos ni habiéndole delegado poder específico para reglamentar los desperdicios biomédicos o clasificarlos como desperdicios sólidos peligrosos, la actuación de promulgar el Reglamento 5717 es ultra vires. No le asiste la razón.
Como reseñamos en la sección anterior, la Junta no sólo tenía autoridad para reglamentar los desperdicios sólidos no peligrosos, tales como los desperdicios biomédicos, sino que la reglamentación aprobada por ella estará vigente y en todo su vigor hasta tanto la Autoridad promulgue otro reglamento. No se cometió este error.
Redondo sostiene, además, que la Junta violó el debido proceso de ley al obligarlo a litigar el caso de autos ante un funcionario adjudicativo sin facultades. Argumenta que la agencia no tiene facultad para nombrar jueces administrativos y al comenzar el caso de marras la agencia no estaba facultada para ello. Nos sugiere que fue mediante orden administrativa y posterior a que comenzara el caso de marras, que se nombró dicho juez administrativo. Arguye que al día de hoy sólo se reconoce la figura del Panel Examinador como organismo o grupo adjudicativo. No le asiste la razón.
De entrada, debemos tener presente que el nombre no hace la cosa. La ley habilitadora de la Junta, conocida como Ley sobre Política Pública Ambiental, según enmendada, Ley Núm. 9 de 18 de junio de 1970, le permite a su director ejecutivo designar uno o más oficiales examinadores para que presidan las vistas a ser celebradas ante dicha agencia administrativa. 12 LPRA sec. 1134 (a). El único reqúisito qué la ley establece es que sea abogado, empleado, miembro de la Junta o experto en la materia objeto de la misma. Id. El Reglamento 3672, ante, establece en su Regla 2.3 que el panel examinador es “[u]na o más personas, nombradas por el Presidente de la Junta para representar a dicha agencia y dirigir sus vistas administrativas”.
Similar autorización para designar oficiales examinadores para presidir procedimientos de adjudicación provee la Sección 3.3 de la Ley de Procedimiento Administrativo Uniforme, 3 LPRA see. 2153. Señala dicha sección de ley que a estos “funcionarios o empleados se les designará con el título de jueces administrativos". Así también, permite la designación para presidir dichas vistas a uno o más funcionarios o empleados. Id.
Como podemos colegir de lo anterior, lo importante no es como se le nombre al que preside la vista administrativa, sino que sea designado por el Presidente de la Junta quien es a su vez el Director Ejecutivo; y que sea un abogado, empleado, miembro de la Junta o experto en la materia a resolverse. No necesariamente tienen que ser más de uno, con uno es suficiente por virtud de ley.
En el caso de autos, el que presidió las vistas administrativas fue un abogado nombrado mediante resolución a esos efectos por el Presidente de la Junta. Tenga presente Redondo que la facultad delegada al Presidente de la Junta para designar dicho juez administrativo, panel examinador o oficial examinador fue realizado por el legislador mucho antes de que comenzara el caso de autos. Tampoco se cometió este error.
En cuanto a la prueba, señala Redondo que las determinaciones de hechos no configuran actos que violen disposición reglamentaria alguna, imponiendo multas cuando no se probó el requisito de adecuacidad de las mismas impuesto por el Reglamento Núm. 3672. Veamos.
*831 A Redondo h/n/c Celsius se le imputó haber violado las siguientes reglas del Reglamento Núm. 5717:

“Regla 531 Prohibiciones Generales

A....

I. Sitios para el manejo de desperdicios sólidos no peligrosos

Ninguna persona ocasionará o permitirá la dispersión, derrame, descarga, depósito, disposición o acumulación de desperdicios sólidos no peligrosos en ningún predio, acera, vía de acceso pública o privada, cunetas, calles o cualquier sitio no autorizado por la Junta de Calida Ambiental. ...

Reglamento Núm. 5717”

Redondo argumenta que la anterior disposición sólo aplica a facilidades que no están autorizadas por la Junta, o sea, vertederos clandestinos. Sostiene que como es una facilidad autorizada por la Junta dicha regla no le es de aplicación. No le asiste la razón.
La Junta determinó que Redondo violó dicha regla al almacenar desperdicios en el piso de áreas no destinadas para ese fin, tales como papeles, hojas, guantes usados, jeringuillas, tener drenajes en el área del incinerador de aguas mezcladas con todo tipo de desperdicios, con apariencia negra y nauseabunda, y una descarga de agua proveniente del proceso de incineración que caía al terreno en dirección a un río colindante. Se le impuso una multa de $1,000.00.
El mismo Reglamento Núm. 5717 en su Regla 511 señala que las disposiciones de éste aplican a todas las instalaciones para este tipo de desperdicios (desperdicios sólidos no peligrosos). Como se desprende del mismo reglamento, le es de aplicación a Redondo la Regla 531 (I) independientemente sus facilidades estén autorizadas por la Junta. De hecho, esta regla se encuentra dentro de las disposiciones generales del Reglamento Núm. 5717 por lo que son de aplicación a toda persona que maneje desperdicios sólidos no peligrosos.
Por otro lado, en cuanto al plan de operación, el Reglamento Núm. 5717 dispone:

“Regla 536 Plan de Operación de Instalaciones para Desperdicios Sólidos No Peligros

A. Toda instalación o actividad reglamentada de desperdicios sólidos cumplirá con un plan de operación escrito y aprobado por la Junta de Calidad Ambiental. El plan de operación será preparado conforme a este Reglamento y de acuerdo con cualesquiera otras guías que la Junta de Calidad Ambiental pueda adoptar.

Reglamento Núm. 5717”

Argumenta Redondo que el plan de operaciones de una facilidad debe describir las actividades propuestas, los procesos a usarse y los procedimientos de emergencia.
La Junta determinó que a Redondo se le aprobó un Manual de Operaciones el cual incumplió. Sostuvo que incumplió con varias secciones del mismo, en específico, no haber ofrecido adiestramiento a sus empleados; permitir que descargas del incinerador impactaran el terreno; al no tener el área de almacenamiento temporero de desperdicios limpia, no tener los desechos segregados, organizados y en condiciones aceptables, tener debajo del incinerador acumulación de líquidos apestosos, no tener las áreas de carga y descarga limpias, organizadas y libres de escombros y desperdicios; recibir desperdicios del cliente o generador sin que éstos estuvieran debidamente segregados, empacados, rotulados e identificados; tener desperdicios mezclados y desechos *832 patológicos que no había sido destruido inmediatamente, permaneciendo varias semanas o meses en la facilidad; no se incineraban debidamente los desechos patológicos quedando fácilmente reconocibles, razón por la cual le fueron rechazados por un tercero al no estar reducidos a cenizas; no limpiar diaria o inmediatamente los recipientes reusables luego de ser vaciados. Se le impuso una multa de $8,400.00. Véase Sección V del Manual de Operaciones de Celsius.

“Regla 582 Requisitos Previos a la Transportación

(E) Requisitos de Almacenamiento

Toda persona que almacene DBR, ya sea previo a tratamiento, disposición o transportación fuera de la instalación, o bajo cualquier otra circunstancia, deberá cumplir con lo siguiente:

1. designar áreas de almacenamiento que deben estar bajo llave y cuyo acceso se limitará al personal autorizado;

2....

3. rotular el área de almacenamiento de manera visible con la siguiente información: “AREA DE ALMACENAMIENTO DE DESPERDICIOS BIOMEDICOS, PERSONAL AUTORIZADO SOLAMENTE”;

4. utilizar un área de almacenamiento y método de almacenamiento que garantice la integridad de los envases y les provea protección contra le agua, la lluvia y el viento;

5. mantener refrigerado todo DBR que así lo necesite para evitar su putrefacción;

6. proteger el área de almacenamiento contra animales. Deberán tomarse todas las medidas necesarias para evitar que dicha área se convierta en un criadero o fuente de alimentación de vectores;

7. mantener en buenas condiciones los paquetes de DBR hasta su tratamiento o transportación fuera de la instalación. Los paquetes de DBR rotos o con filtraciones serán reempacados;

8. limpiar y descontaminar cualquier superficie del área de almacenamiento que tenga contacto directo con DBR derramado, utilizando un agente desinfectante apropiado de uso comercial o industrial por espacio mínimo de tres (3) minutos;

9. utilizar un método de almacenamiento para el DBR que evite la generación de olores objetables;

10....

Reglamento Núm. 5717”

Sobre este particular, Redondo argumenta que la Junta pretende que se cambie su facilidad de almacenaje, el cual ya fue aprobado al otorgársele el permiso de operación. Señala que la Junta no puede ir contra sus propios actos, ya que nunca le solicitó cambios en dicha area de almacenamiento y que ha operado de la misma manera con su conocimiento y aprobación: No nos convence.
La Junta encontró probado que su personal técnico observó el 14 de febrero de 2002, bolsas plásticas identificadas como DBR y recipientes para reuso amontonadas sin orden alguno, que no indicaban el tipo de desperdicio, fecha de transportación ni de empaque; alrededor de éstos se observó la presencia de vectores *833 (moscas y mimes); en el área del incinerador se observaron recipientes vacíos y conteniendo DBR; algunos estaban abiertos o rotos expuestos a la lluvia y al viento; se percibieron olores fétidos, podridos y desagradables en el área de almacenamiento y del incinerador a pesar de que Redondo utilizaba detergentes para evitarlo.
Luego el 26 de marzo de 2002, se volvió a observar acumulación de desperdicios biomédicos regulados y patológicos que no estaban en un área debidamente rotulada; se observó en el interior del almacén desperdicios biomédicos regulados y desperdicios no peligrosos mezclados; desperdicios biomédicos a la intemperie y algunos desperdicios patológicos sin refrigerar; se encontraron vectores en el área del almacén y del incinerador; y volvieron a percibir olores fétidos, podridos y desagradables; cajas y bolsas rotas con desperdicios biomédicos regulados en el piso. La Junta le impuso una multa de $8,400.00.

“Regla 582 Requisitos Previos a la Transportación

(F) Reutilización de Recipientes

Los generadores, transportadores, manejadores intermedios e instalaciones de disposición final de DBR deberán cumplir con las siguientes normas para el reuso de recipientes y envases:

3. los recipientes reusables se limpiarán y desinfectarán inmediatamente después de cada uso, utilizando un agente desinfectante apropiado de uso comercial o industrial por espacio mínimo de tres (3) minutos;

Reglamento Núm. 5717”

Redondo plantea que la Junta sólo pudo probar que un sólo recipiente tenía líquido en su fondo, concluyendo luego de la inspección que no había sido limpiado inmediatamente después de su uso. Sostiene que la evidencia no fue basada en prueba científica como un análisis químico del contenido del recipiente, todo ello a pesar de tener los recursos económicos y la infraestructura para así hacerlo. No nos convence.
La Junta resolvió que el 14 de febrero de 2002, violó este inciso al observarse que los recipientes de biomédicos para reuso estaban vacíos, pero sin limpiar. Reseñó en la resolución recurrida que el señor Angel Pérez Rovira, Gerente General y Vicepresidente de Redondo, le indicó al personal de la Junta durante la inspección, que dichos recipientes eran limpiados al momento de ser trasladados a las instalaciones de los generadores. Dicha violación fue observada nuevamente en la reinspección del 26 de marzo de 2002. La Junta le impuso una multa de $8,400.00.

“Regla 584 Normas para Manejadores Intermedios e Instalaciones de Disposición Final

A....

B. Aceptación de desperdicios biomédicos regulados

Ninguna instalación aceptará DBR si no están envasados etiquetados, marcados y acompañados por un manifiesto, según lo requiere este Capitulo, aquellos generadores exentos de manifiesto deberán llevar una bitácora.

C. Obligaciones generales

*834
Todo manejador intermedio o instalación de disposición final deberá:

(1) mantener sus instalaciones deforma adecuada o higiénica;

4. en el caso de de instalaciones dé disposición final disponer del desperdicio dentro de los quince (15) días siguientes a su recibo;

D. Procesos para tratamiento

La instalación para tratamiento de DBR deberá realizar procesos que cambien el carácter o composición biológica de cualquier desperdicio, de forma que se reduzca sustancialmente o elimine su potencial de causar enfermedades.

E. Procesos para la destrucción

La instalación para destrucción de DBR deberá realizar procesos que garanticen, en cada clase de DBR, más de un ochenta por ciento (80%) de eficiencia al arruinarlos, mutilarlos o romperlos en pedazos, de forma que no sean reconocibles como DBR.

F. Desperdicios patológicos

Los desperdicios patológicos se dispondrán sólo mediante incineración. ”

En cuanto a estas violaciones, Redondo argumenta que la Junta nunca estuvo presente en la facilidad al momento de recibirse los desperdicios. Con relación al mantenimiento adecuado e higiénico de las facilidades, nos plantea que dicha regla no ofrece parámetro alguno por lo que adolece de vaguedad y ambigüedad, por lo tanto es inconstitucional. En cuanto a la violación del inciso D de esta regla, arguye que no le es de aplicación por dedicarse a la incineración de DBR, un proceso de destrucción y no de descomposición. De igual manera sostiene que el inciso E no le aplica, toda vez que por utilizar incinerador el resultado son cenizas. No le asiste la razón.
La Junta encontró probado que en la inspección del 14 de febrero se encontraron bolsas plásticas identificadas con DBR rotas, desperdicios en el suelo, bolsas identificadas del Hospital San Pablo con fecha de 4 de enero sin número de manifiesto, excepto dos bolsas con manifiesto número 218706, otra bolsa con fecha de 6 de enero. Dichas bolsas fechadas contaban con más de los quince días reglamentarios y tenían que haber sido tratadas antes de la inspección. Se encontraron desperdicios patológicos fechados con 1 de octubre de 2001 proveniente del Hospital Menonita, por lo que incumplieron con la incineración inmediata que requiere su Plan de Operaciones.
Entendió la Junta que Redondo también violó los acápites D y E pues se encontraron dos recipientes conteniendo desperdicios incinerados entre los cuales claramente se reconocían los sueros con sus líneas, jeringuillas, contenedores para desperdicios punzantes, pedazos de extremidades, restos humanos chamuscados y bolsas plásticas sin destruir. Muchos de los desperdicios estaban casi intactos y no destruidos en un 80 por ciento como se requiere por ley.
En la reinspección del 26 de marzo, el personal de la Junta volvió a observar, en el almacén y en el patio, dentro de unos furgones, recipientes, cajas y bolsas conteniendo desperdicios biomédicos y patológicos que excedían de los quince días de recibidos sin haber sido tratados. Así también, desperdicios biomédicos que luego *835 de haber sido incinerados permanecían reconocibles.
La multas impuestas por estas violaciones fueron: por el inciso (B) $8,400.00; inciso (C) (1) $8,400.00; el inciso C (4) $8,400.00; el inciso (D) (5) $8,400.00; y el inciso (E) $8,400.00.

“Regla 585 Uso de Manifiesto para Desperdicios Biomédicos

F. Obligaciones de instalaciones de disposición final de DBR

1. Toda instalación de disposición final que reciba DBR con un manifiesto deberá:

a) firmar y fechar el manifiesto certificando haber recibido los DBR;

b) anotar cualquier discrepancia, si alguna;

c) entregar al transportador al recibir el manifiesto una copia firmada del mismo.

2. Luego de que la instalación de disposición final disponga los DBR acompañados por un manifiesto, deberá enviar la hoja original del manifiesto al generador, dentro del término de quince (15) días de haber recibido el desperdicio. Este manifiesto deberá estar acompañado de una certificación que indique que los DBR señalados fueron tratados y destruidos.

3. Retener la copia correspondiente del manifiesto en su registro para inspección por la Junta de Calidad Ambiental.

Reglamento Núm. 5717”

Sobre este particular, Redondo sostiene que del manifiesto presentado en evidencia por la Junta se estableció que se cumplió con el Reglamento 5717, toda vez que se envió tanto el original del manifiesto como a la certificación de incineración dentro del plazo de 15 días, según lo prescrito en la regla; por lo tanto, no hubo violación alguna.
La Junta encontró probado que el 14 de febrero de 2002, Redondo no suplió el original del manifiesto número 218706 cuando aún este desperdicio no había sido incinerado. Copia de este manifiesto fue encontrado en el Hospital San Pablo (generador) junto con una certificación de incineración emitida por Celsius indicando que el desperdicio fue destruido, lo cual era incorrecto. Este tipo de violación fue detectada nuevamente por el personal de la Junta en la reinspección del 26 de marzo.
También a Redondo h/n/c Celsius se le imputó haber violado la siguiente regla del Reglamento Núm. 5300:

“Regla 603 Contenido del Permiso

Cada permiso emitido por la Junta, según las reglas de la Parte VI para el Estado Libre Asociado de Puerto Rico, deberá incluir los siguientes elementos

(A) Requisitos estándares del permiso

(7) El permiso contendrá disposiciones que indique lo siguiente;

*836
(i) El usuario de permiso deberá cumplir con todas las condiciones del permiso. Cualquier incumplimiento con el permiso constituirá una violación de Ley y será base para tomar acción de cumplimiento, para terminar el permiso, revocarlo y reexpedirlo, o modificarlo, o para denegar una solicitud de renovación de permiso.

(ii) El usuario no podrá alegar como defensa, en una acción de cumplimiento, el que hubiese sido necesario detener o reducir la actividad permitida para poder mantener el cumplimiento con las condiciones del permiso.

(iii) El permiso puede modificarse, revocarse, reabrirse y reexpedirse, o terminarse por causa. La presentación de una petición, por parte del usuario del permiso, para la modificación, revocación, reexpedición, o terminación del permiso, o de una notificación de cambios planificados o de un incumplimiento anticipado, no suspende ninguna de las condiciones del permiso.

(iv) El permiso no traspasa derecho de propiedad de clase alguna, o derecho exclusivo alguno.

Reglamento Núm. 5300”

En cuanto a este error, Redondo plantea que la Junta estaba impedida de emitir una querella administrativa por alegadas violaciones al Reglamento Núm. 5300, toda vez que la primera se encontraba operando bajo un plan de cumplimiento. Ademas sostiene que la Junta estaba impedida de solicitar requisitos adicionales al permiso emitido a Redondo y su plan de cumplimiento, el cual estaba ya aprobado. Argumenta es arbitrario e irrazonable de la Junta exigir el cumplimiento de un Permiso de Título V, causándole serios daños económicos. Se equivoca nuevamente Redondo.
La Junta, por su parte, encontró probadas las siguientes deficiencias al Reglamento Núm. 5300 y al Plan de Cumplimiento:

“1. No se realizó el muestreo de la chimenea hasta el 31 de julio de 2001, en violación de la Sección X (1) (E) del Permiso de Operación aprobado y de la Regla 405(A)(3) del Reglamento Núm. 5300, la cual establece que dicho muestreo debió realizarse en el año 2000.

2. Sometió los cálculos de emisión el 29 de junio de 2001, cuando debía haberlos sometidos en o antes del primero de abril de cada año, cubriendo las emisiones del año natural anterior. Violación a la Sección II (30) del Permiso de Operación.

3. No tenía disponible un Plan de Emergencias según requerido por la condición 4 de la Sección III del Permiso de Operación.

4. No notificó la pérdida de material refractario en la coraza de la cámara primaria, según lo requiere la condición 14 de la Sección III del Permiso de Operación.

5. No cumplieron con los parámetros operacionales descritos en la Sección V del Permiso de Operación, pues no llevaban un registro de la razón de incineración para demostrar su cumplimiento con el límite de 1,680 lb. /hr., observándose temperatura menores de 1,460° F en la cámara primaria y temperaturas menores de 1,700° F en la cámara secundaria hasta él 11 de enero de 2002.

6. No se proveyó almacenaje adecuado a los desperdicios, según requerido por la condición 1, Sección VI del Permiso de Operación, ya que se observaron desperdicios biomédicos con objetos filosos abiertos y gran cantidad de vectores.

*837 7. No instalaron el sistema de pesaje o balanza para llevar la contabilización de las libras cargadas al incinerador como requiere la condición 3, Sección VI del Permiso de Operación.

8. No se había instalado el medidor de opacidad en la chimenea del incinerador como lo requería la condición 2(B), Sección IX del Permiso de Operación.

. 9. No realizaron lecturas de emisiones visibles requeridas una vez al año durante el primer año por la condición 2(B), Sección IX del Permiso de Operación. ”

La Junta le impuso a Redondo una multa de $8,400.00 por estas violaciones.
Con relación al tercer y quinto error, atacan asuntos que caen dentro de la doctrina de deferencia administrativa que es norma firmemente establecida para la revisión judicial de los tribunales apelativos. Dicha norma nos obliga ha conceder una gran deferencia a las decisiones administrativas, debido a que éstas cuentan con vasta experiencia y los conocimientos especializados en los asuntos que le han sido encomendados. T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 80 (1999); Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 130 (1998). El Tribunal Supremo ha resuelto que en nuestra jurisdicción los procedimientos y las decisiones de las agencias administrativas gozan de una presunción de regularidad y corrección. Rivera Concepción v. A.R.P.E., 152 D.P.R. 116 (2000); Com. Vec. Pro-Mej., Inc. v. J.P., 147 D.P.R. 750, 761 (1999); Misión Ind. P.R. v. J.P., supra; Henríquez v. Consejo Educación Superior, 120 D.P.R. 194, 210 (1987); Murphy Bernabé v. Tribunal Superior, 103 D.P.R. 692, 699 (1975).
La revisión judicial de una decisión administrativa suele circunscribirse a determinar si: (1) el remedio concedido por la agencia fue apropiado; (2) las determinaciones de hechos realizadas por la agencia están sostenidas por evidencia sustancial en el expediente administrativo; y (3) las conclusiones de derecho fueron correctas. Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme (“LPAU’,), 3 L.P.R.A. § 2175; Rivera v. A & C Development Corp., 144 D.P.R. 450, 460-461 (1997).
Con relación a las determinaciones de hechos de una agencia administrativa, el Tribunal Supremo ha resuelto que “estamos obligados a sostener tales determinaciones si están respaldadas por evidencia suficiente que surja del expediente administrativo considerado en su totalidad’. Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70 (2000). Véase, además, Costa, Piovanetti v. Caguas Expressway, 149 D.P.R. 881 (1999); Misión Ind. P.R. v. J.P., supra, pág. 131; Sección 4.5 de la LPAU, supra. Se ha definido evidencia sustancial como “aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión”. Asoc. Vec. H. San Jorge v. U. Med. Corp., supra; Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. 425, 437 (1997); Misión Ind. P.R. v. J.P., supra, pág. 131; Hilton Hotels v. Junta de Salario Mínimo, 14 D.P.R. 670, 687 (1953). El tribunal debe considerar la evidencia en su totalidad, tanto la que sostenga la decisión administrativa, como la que menoscabe el peso que la agencia le haya conferido. Misión Ind. P.R. v. J.P., supra, pág. 131; Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., supra; Hilton Hotels v. Junta de Salario Mínimo, supra, pág. 686. Como se explicara en Reyes Salcedo v. Policía de P.R., 143 D.P.R. 85, 95 (1997), “la norma de la evidencia sustancial... persigue evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor”. Véase también P.R.T.C. v. J. Reg. Tel. de P.R., 151 D.P.R. 269 (2000). Conforme a la referida norma, el tribunal limita su intervención a evaluar si la decisión administrativa es razonable. En caso de que exista más de una interpretación razonable de los hechos, el tribunal debe sostener la que seleccionó la agencia, y no sustituir su criterio por el de ésta. Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., supra; J.R.T. v. Línea Suprema, Inc., 89 D.P.R. 840, 849 (1964).
En el caso de autos, hemos examinado y considerado el voluminoso expediente administrativo en su totalidad, no hallando evidencia que mueva a este Tribunal ha sustituir el criterio de la Junta. Lejos de ello, existe en el expediente evidencia sustancial que sostiene la conclusión de la agencia administrativa. La resolución emitida por *838 la Junta contiene todos los requisitos de ley antes esbozados e indica los documentos y/o criterios tomados en consideración para la adjudicación de la querella.
Por lo tanto, Redondo tenía que presentar evidencia suficiente para derrotar tal presunción, no pudiendo descansar únicamente en meras alegaciones. Rivera Concepción v. A.R.P.E., supra; Com. Vec. Pro-Mej., Inc. v. J. P., supra; Misión Ind. P.R. v. J.P., supra; Henríquez v. Consejo Educación Superior, supra. Somos del criterio que Redondo fálló én presentar prueba suficiente, que demuestre la ausencia de factores racionales o razonables para la determinación de la agencia, y en demostrar un perjuicio o una violación a los estatutos o reglamentos aplicables. DeMat Air, Inc. v. U.S., 2 Cl. Ct. 202 (1983). Tampoco demostró que la decisión de la Junta estuviera viciada por fraude o fuera claramente irrazonable. Empreas Toledo, Inc. v. Junta, ante.
Por tanto, limitada nuestra revisión judicial de una actuación administrativa a evaluar la razonabilidad de la decisión recurrida, sostenemos la misma por no demostrarse que sea una arbitraria o caprichosa. Cruz Negrón v. Administración de Corrección, res. el 28 de marzo de 2005, 2005 J.T.S. 39; Ramírez v. Depto. de Salud, 147 D.P.R. 901 (1999); Empresas Toledo, Inc. v. Junta, ante.
IV
Por los fundamentos expuestos, se confirma la resolución aquí recurrida.
Lo acordó y ordena el Tribunal, y lo certifica la Secretaria Interina del Tribunal de Apelaciones.
Mildred I. Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones
ESCOLIOS 2007 DTA 24
1. Los desperdicios biomédicos son aquellos desperdicios sólidos generados durante el diagnostico, tratamiento, prestación de servicios médicos o inmunización de seres humanos o animales; en la investigación relacionada con éstos o en la producción, o ensayo con productos biológicos.
2. Reglamento Núm. 5300.